IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

HUMPHREYS & PARTNERS               )
ARCHITECTS, L.P.,                  )
    Plaintiff,                     )
                                   )        Case No. 1:13-cv-433
    v.                             )
                                   )
LESSARD DESIGN, INC., *et al.*,    )
    Defendants.                    )

## MEMORANDUM OPINION

This is an architectural works copyright infringement action.  Plaintiff claims that defendants' design and construction of the high-rise apartment building known as "Two Park Crest" in McLean, Virginia, infringes plaintiff's architectural works copyright embodied in a high-rise condominium building in Minneapolis, Minnesota, known as Grant Park.  Defendants deny infringement, contending that they did not copy the Grant Park design and that the Two Park Crest design is not substantially similar to, and hence does not infringe the Grant Park design.  Defendants also assert various counterclaims and defenses, including a challenge to the validity of the copyright and to its enforceability.  Following full discovery, the parties filed numerous motions, cross-motions, and partial motions for summary judgment, all of which have been fully briefed and are now ripe for disposition.

**I.**

**A. Parties**

Plaintiff Humphreys & Partners Architects, L.P. ("Humphreys") is a limited partnership organized under the laws of Texas with its principal place of business in Dallas, Texas. Humphreys claims to be the author and sole owner of the copyright in the Grant Park design,

which is registered as an architectural work with the United States Copyright Office as Number VAu 579-008, with an effective date of February 19, 2003. Mark Humphreys ("Mr. Humphreys") is the founder, president, and CEO of Humphreys.

The nine defendants currently in this case fall into four groups: (1) the Lessard defendants, (2) the Penrose defendants, (3) the Northwestern defendants, and (4) Clark Builders Group.

### 1. The Lessard Defendants

Defendant Lessard Design, Inc. ("Lessard Design") is a corporation organized under the laws of Virginia with its principal place of business in Vienna, Virginia. After the dissolution of Lessard Urban Inc. ("Lessard Urban")—the entity originally hired to design the Two Park Crest project—the dissolved company's revenues flowed into Lessard Design. Thus, Lessard Design is the successor to Lessard Urban as the designer of Two Park Crest. Lessard Design is a subsidiary of co-defendant Lessard Group Inc. ("Lessard Group"), a corporation organized under the laws of Virginia with its principal place of business in Vienna, Virginia. Lessard Group is the parent corporation of co-defendant Lessard Design.

Defendant Christian J. Lessard ("Mr. Lessard"), an architect who resides in Virginia, is the sole shareholder of Lessard Design and was a majority shareholder (90%) of Lessard Urban. Mr. Lessard was an employee of Lessard Urban and Lessard Group until December 2010, at which time he became an employee of Lessard Design. During the time that he was an employee of each of these companies, Mr. Lessard drew a salary from the company he was working for at the time. Mr. Lessard worked on the Two Park Crest project as a consultant and he personally guaranteed Lessard Design's performance on the Two Park Crest project. Lessard Design, Lessard Group, and Mr. Lessard are collectively referred to as the "Lessard defendants."

- 2 -

## 2. The Penrose Defendants

Defendant The Penrose Group, which has its principal place of business in Vienna, Virginia, is an ongoing enterprise of individuals who have joined together by mutual consent for the purpose of creating and promoting various real estate and other development projects. Once development activities for a particular project have proceeded to a certain point, The Penrose Group forms one or more project-specific companies to manage the development project. Individuals who are members of The Penrose Group include Mark Gregg, Olav Kollevoll, Tim McDonald, and Ron Testa. The Penrose Group was involved in the development of Two Park Crest as early as 2008. In 2010, The Penrose Group was responsible for soliciting design services proposals for Two Park Crest and for eventually hiring Lessard Urban as the architect for the project.

Defendant Sixth Penrose Investing Company LLC ("Sixth Penrose") is a limited liability investment company organized under the laws of Virginia with its principal place of business in Vienna, Virginia. The Penrose Group created Sixth Penrose in early 2011 as a single-purpose entity to enter into a joint venture with an unrelated company—The Donohoe Companies, Inc. ("Donohoe")—to create PDT Builders LLC ("PDT"), a limited liability company organized under the laws of Virginia with its principal place of business in Vienna, Virginia, for the purpose of managing the development of the Two Park Crest project.

In the parlance of the real estate development industry, PDT was the "fee developer" for the Two Park Crest project. As a majority investing member, Sixth Penrose has a 70% stake in PDT and Donohoe has a 30% stake in PDT. The Penrose Group, Sixth Penrose, and PDT are collectively referred to as the "Penrose defendants."

- 3 -

### 3. The Northwestern Defendants

Defendant The Northwestern Mutual Life Insurance Company ("Northwestern Mutual") is a corporation organized under the laws of Wisconsin with its principal place of business in Milwaukee, Wisconsin.  In January 2011, Northwestern Mutual purchased the Two Park Crest property from The Penrose Group and hired PDT to facilitate the development of the Two Park Crest project and to coordinate the efforts of the contractor, the architect, and other entities hired to perform work for the development project on Northwestern Mutual's behalf.

Defendant Northwestern Investment Management Company, LLC ("Northwestern Investment") is a limited liability company organized under the laws of Wisconsin with its principal place of business in Milwaukee, Wisconsin.  Northwestern Investment is a subsidiary of Northwestern Mutual and is responsible for Northwestern Mutual's real estate management functions. Northwestern Mutual and Northwestern Investment are collectively referred to as the "Northwestern defendants."

### 4. Clark Builders Group

Defendant Clark Builders Group, LLC ("Clark") is a limited liability company organized under the laws of Maryland with its principal place of business in Bethesda, Maryland. Northwestern Mutual contracted with Clark to construct the Two Park Crest project. Clark obtained the building permit for the project on March 22, 2012.

The following table summarizes the nine co-defendants and their relationship to Two Park Crest:[1]

---

[1] The initial complaint, filed on April 9, 2013, listed seven defendants: (1) Lessard Design, (2) Lessard Group, (3) Mr. Lessard, (4) Clark, (5) PDT, (6) Penrose Partners, and (7) The Penrose Group. Thereafter, the Northwestern defendants and Sixth Penrose were added as defendants on

| Defendant | Defendant Group (if any) | Relationship to Two Park Crest |
|---|---|---|
| (1) Lessard Design, Inc. ("Lessard Design") | "Lessard defendants" | When Lessard Urban Inc. ("Lessard Urban")—the entity originally hired to design the Two Park Crest project—was dissolved, its revenues flowed into Lessard Design. |
| (2) Lessard Group Inc. ("Lessard Group") | | Parent corporation of Lessard Design. |
| (3) Christian J. Lessard ("Mr. Lessard") | | Sole shareholder of Lessard Design; Majority shareholder (90%) of Lessard Urban. |
| (4) The Penrose Group | "Penrose defendants" | Fee developer for Two Park Crest; Solicited design services proposals for Two Park Crest; Hired Lessard Urban as the architect for Two Park Crest. |
| (5) Sixth Penrose Investing Company LLC ("Sixth Penrose") | | Single-purpose entity created by The Penrose Group; Majority investing member and joint venture partner in PDT. |
| (6) PDT Builders, LLC ("PDT") | | Single-purpose entity formed as joint venture between Sixth Penrose and an unrelated company; Hired by Northwestern Mutual to facilitate development of Two Park Crest and to coordinate the contractor, architect, etc. on behalf of Northwestern Mutual, for a fee. |
| (7) The Northwestern Mutual Life Insurance Company ("Northwestern Mutual") | "Northwestern defendants" | Owner of Two Park Crest property since January 2011. |
| (8) Northwestern Investment Management Company, LLC ("Northwestern Investment") | | Subsidiary of Northwestern Mutual responsible for the entity's real estate management functions. |
| (9) Clark Builders Group, LLC ("Clark") | N/A | Responsible for construction of Two Park Crest. |

## B. Facts

The allegedly protected Grant Park design originally appeared in architectural plans and drawings, and thereafter was embodied in a building constructed in 2004 in Minneapolis,

---

August 20, 2013, *Humphreys v. Lessard*, 1:13-cv-433 (E. D. Va. Aug. 20, 2013) (Second Am. Compl.), and Penrose Partners was dismissed as a defendant by an agreed stipulation on September 4, 2013. *Humphreys v. Lessard*, 1:13-cv-433 (E. D. Va. Sept. 4, 2013) (Order). In addition, Park Crest SPE Phase I, LLC and Penrose/Donohoe Tysons, LLC were added as defendants on August 20, 2013, *Humphreys v. Lessard*, 1:13-cv-433 (E. D. Va. Aug. 20, 2013) (Second Am. Compl.), but were subsequently dismissed from the case by an agreed stipulation on November 25, 2013. *Humphreys v. Lessard*, 1:13-cv-433 (E. D. Va. Nov. 25, 2013) (Order).

Minnesota known as the Grant Park Condominium building. Grant Park is a 27-story condominium building with an average of 11 condominium units per floor. The Grant Park design features two elevator shafts that offer direct access from residential units to elevator lobbies.[2]

The allegedly infringing Two Park Crest building, which is currently being developed in McLean, Virginia, is a 19-story apartment building with an average of 17 rental units per floor. Two Park Crest also features two elevator shafts that offer direct access from residential units to elevator lobbies.[3] Two Park Crest is part of a multi-building development that was created and approved by Fairfax County in 2004. As originally planned and approved, Two Park Crest included a condominium building. However, as a result of the 2008-09 economic crisis, the condominium building originally planned for the Two Park Crest site was never built. In the summer of 2010, the owners of the land began discussing plans for an apartment building at the Two Park Crest site.

### 1. Lessard Urban/Design's Selection as Architect for Two Park Crest

In developing the Two Park Crest apartment project, The Penrose Group considered three architects: (i) Lessard Urban/Design,[4] (ii) Humphreys, and (iii) Washington Design Group. The Penrose Group met with representatives of both Humphreys and Lessard Urban/Design in late

---

[2] An exterior view of the Grant Park Condominiums is included in Appendix A. A view of the Grant Park design floor plan is included in Appendix B.

[3] An exterior view of Two Park Crest is included in Appendix A. A view of the Two Park Crest design floor plan is included in Appendix B.

[4] The summary judgment record does not specify the date on which Lessard Urban was dissolved and its revenues began flowing into Lessard Design. Accordingly, the entity that was Lessard Urban and became Lessard Design will be referred to as Lessard Urban/Design.

October 2010. Specifically, on September 30, 2010, The Penrose Group requested a proposal from Humphreys. Humphreys responded by submitting to The Penrose Group representatives a written proposal and illustrations of the Grant Park design. During the proposal and bidding process, Humphreys' representatives met with Mark Gregg and Tim McDonald of The Penrose Group on October 6, 2010, and Humphreys' representatives again met with Penrose Group representatives—this time Tim McDonald and Olav Kollevoll—on October 27, 2010.

Subsequently, on November 2, 2010, The Penrose Group selected Lessard Urban/Design to design the Two Park Crest project. According to The Penrose Group, Lessard Urban/Design was selected for three reasons:

    i.    Lessard Urban/Design submitted a lower bid,

    ii.    Lessard Urban/Design was local and had already designed the building next door to Two Park Crest, and

    iii.    Lessard Urban/Design presented a design with a high percentage of rentable apartment space.

Tim McDonald of The Penrose Group informed Humphreys of the decision to hire Lessard Urban/Design on November 17, 2010. Following Northwestern Mutual's purchase of Two Park Crest from the Penrose Group in January 2011, the Northwestern defendants entered into a contract with Lessard Urban/Design, which gave Northwestern Mutual control over the design throughout the design process. Lessard Urban/Design architect John Jenkins ("Mr. Jenkins") served as principal architect on the Two Park Crest project until he left Lessard Urban/Design,[5] and Mr. Lessard worked on the project as a consultant.

---

[5] The record does not reflect the exact date on which Mr. Jenkins left Lessard Urban/Design.

### 2. PDT's Formation as Two Park Crest Fee Developer

In early 2011, The Penrose Group created Sixth Penrose as a single-purpose entity to form a joint venture with Donohoe, and this joint venture in turn created PDT for the purpose of managing the development of the Two Park Crest project.   Under PDT's operating agreement, Sixth Penrose has a 70% stake and Donohoe has a 30% stake in PDT.   PDT and Northwestern Mutual entered into a Development Agreement in January 2011, pursuant to which Northwestern Mutual hired PDT as a fee developer to facilitate the development of the Two Park Crest project and to coordinate the efforts of the contractor, the architect, and other entities hired to perform work for the development project on Northwestern Mutual's behalf.

### 3. Northwestern Mutual's Acquisition of Two Park Crest

In mid-2010, Northwestern Investment began examining the possibility of purchasing the Two Park Crest property from The Penrose Group, with The Penrose Group staying involved as a fee developer.   Thereafter, in October 2010, Northwestern Mutual sent a non-binding letter of intent to The Penrose Group.   Then, in December 2010, the parties executed a binding contract, and Northwestern Mutual's acquisition of Two Park Crest closed in January 2011.   The purchase included the architectural plans prepared by Lessard Urban/Design.   Thus, the Northwestern defendants were engaged in negotiations to purchase Two Park Crest during the same time period—October 2010 through January 2011—that The Penrose Group was soliciting design bids and ultimately selecting Lessard Urban/Design as the architect for Two Park Crest.   And in January 2011, both (i) Northwestern Mutual's acquisition of Two Park Crest and (ii) Northwestern Investment's contract with Lessard Urban/Design were finalized.

#### 4. Clark's Selection as Builder of Two Park Crest

In the fall of 2011, PDT representatives requested proposals for the construction of Two Park Crest. To permit potential builders to submit accurate bids, PDT distributed to bidders a "Construction Set" of the building documents for Two Park Crest prepared by Lessard Urban/Design. This Construction Set of building documents sets forth detailed requirements for the construction of the building project, including illustrative drawings and written requirements relating to building materials and equipment to be used in the project. Clark submitted a proposal for the construction of Two Park Crest based on the Construction Set of building documents, and shortly thereafter Northwestern Mutual accepted Clark's proposal. On November 23, 2011, Northwestern Mutual and Clark entered into the Prime Contract, pursuant to which Northwestern Mutual hired Clark to construct Two Park Crest in accordance with the existing Fairfax County-approved master site plan requirements for the building. At the time the Prime Contract was signed, architectural and design-related drawings and plans had been submitted to Fairfax County for approval, and after Fairfax County approved the new plans, Clark began construction on a completed set of permit-ready construction drawings. Thus, Clark became a part of the Two Park Crest project months after Lessard Urban/Design's allegedly infringing design had been finalized.

#### 5. The Alleged Copying

Humphreys' claim of copying is premised on two undisputed facts. First, in January 2005, Mr. Lessard attended a conference in Orlando, Florida, at which Mr. Humphreys gave a presentation titled "What's Hot in Multifamily Design." The presentation included images of the Grant Park design. Second, on November 3, 2010, during the Two Park Crest architect bidding and selection process, Tim McDonald sent Mr. Lessard and Mr. Jenkins an email containing the

Grant Park design. Humphreys alleges that, after seeing the Grant Park design on those two instances, the Lessard defendants copied the Grant Park design and used that copied design for the Two Park Crest project.

### 6. This Case

On April 9, 2013, Humphreys filed an action alleging one count of copyright infringement of the Grant Park design against all defendants, pursuant to 17 U.S.C. § 101, *et seq*. A series of motions to dismiss and amended complaints ensued, finally resulting in the filing, on October 4, 2013, of the Third Amended Complaint, which also alleges one count of copyright infringement against all defendants.

Defendants, in response, each denied copying and infringement and asserted various counterclaims against Humphreys. Specifically, defendants brought counterclaims for: (i) declaratory judgment of non-infringement (brought by the Lessard defendants, the Penrose defendants, and Clark); (ii) declaratory judgment of unenforceability (brought by the Lessard defendants, the Penrose defendants, and Clark); (iii) declaratory judgment of invalidity (brought by the Lessard defendants, the Penrose defendants, and Clark); (iv) false advertising pursuant to 15 U.S.C. § 1125(a)(1)(B) (brought by the Lessard defendants); and (v) copyright violation pursuant to 17 U.S.C. § 101, *et seq.*, arguing that Humphreys copied the Grant Park design from Lessard Design's Harbor Towers design, which is the subject of two pending copyright applications (brought by Lessard Design).

After full discovery, the parties filed the following seven motions, cross motions, and partial motions for summary judgment:

      i.    Lessard defendants' motion for summary judgment addressing noninfringement and infringers' profits, filed by Lessard Design, Lessard Group, and Mr. Lessard, in which the Lessard defendants argue that Humphreys has failed to proffer evidence

creating a triable issue of fact that the Two Park Crest design infringes the Grant Park design because the designs are not substantially similar, and that there is no basis for recovery of defendants' profits because those profits are not attributable to the alleged infringement;

ii.   Defendant Mr. Lessard's motion for summary judgment dismissing the claims against him, in which Mr. Lessard argues that he cannot be held personally liable for any alleged infringement because Humphreys has offered no evidence that Mr. Lessard personally participated in the preparation of the allegedly infringing design;

iii.  Defendant Clark's motion for summary judgment addressing noninfringement and infringers' profits, in which Clark argues that there is no evidence that Clark infringed the Grant Park design and that Clark is not liable for infringers' profits;

iv.   Plaintiff Humphreys' motion for partial summary judgment on a portion of its claim, as well as defendants' counterclaims and affirmative defenses, in which Humphreys argues that summary judgment for Humphreys is appropriate on all of defendants' counterclaims and affirmative defenses;

v.    Northwestern defendants' motion for summary judgment addressing noninfringement and infringers' profits, filed by Northwestern Investment and Northwestern Mutual, in which the Northwestern defendants argue that there is no evidence that the Northwestern defendants infringed the Grant Park design and that there is no evidence that any portion of the Northwestern defendants' profits are attributable to the alleged infringement;

vi.   Defendant Sixth Penrose's motion for summary judgment on noninfringement, in which Sixth Penrose argues that, as an investment company that played no role in the design or construction of the allegedly infringing design, it cannot be found liable for vicarious infringement;

vii.  Penrose defendants' motion for summary judgment addressing noninfringement and infringers' profits, filed by The Penrose Group, Sixth Penrose, and PDT, in which the Penrose defendants argue that Humphreys has failed to proffer evidence creating a triable issue of fact that the Two Park Crest design infringes the Grant Park design because the designs are not substantially similar, and that there is no basis for recovery of defendants' profits because those profits are not attributable to the alleged infringement.

## II.

The summary judgment standard, which the parties do not dispute, is too well-settled to merit extended discussion. Summary judgment is appropriate where "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. P. It is settled that "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). And all evidence and reasonable inferences that may be drawn from that evidence must be construed in the light most favorable to the nonmoving party. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Yet, it is clear that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" as a basis for denying summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Nor can "conclusory allegations, mere speculation," or "the building of one inference upon another" support a denial of summary judgment. *Dash*, 731 F.3d at 311. Rather, in a civil case governed by a preponderance of the evidence standard, the proper summary judgment inquiry is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* And it follows that if the nonmoving party "fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered." *Id.*

### III.

Prior to 1990, United States copyright law did not afford protection to architectural works. *See* 1 *Nimmer on Copyright* § 2.20(A). This changed in 1990 when Congress, in response to the requirements of the Berne Convention, enacted the Architectural Works Copyright Protection Act ("AWCPA"), which amended the Copyright Act to provide that "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, . . . [including] architectural works." 17 U.S.C. § 102(a). The AWCPA defines an "architectural work" as "the design of a building as embodied in any tangible medium of

expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101. Thus, architectural works are protectable either as three-dimensional buildings or as two-dimensional plans or drawings. *See* 1 *Nimmer on Copyright* § 2.20(A). The AWCPA also makes clear that the protected work "includes the overall form as well as the arrangement and composition of spaces and elements in the design." 17 U.S.C. § 101. But importantly, this copyright protection does not extend to "individual standard features." *Id.* Examples of such individual standard features include "windows, doors, and other staple building components." *Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC*, 496 F. App'x 314, 317 (4th Cir. 2012) (citing 37 C.F.R. § 202.11(d)(2)) [hereinafter *Ross II*]. In addition to these standard features, "standard configurations of spaces"[6] and design elements that are functionally required are also not protectable under the AWCPA.[7]

Copyright infringement requires proof of two elements: "a plaintiff must prove [i] that it owned a valid copyright and [ii] that the defendant copied the *original* elements of that copyright." *Bldg. Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573, 578 (4th Cir. 2013) (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001) (emphasis added)). With respect to the first step of the inquiry, a certificate of copyright registration "constitutes[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Yet, "this presumption is fairly easy to rebut because the

---

[6] *See Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC*, 977 F. Supp. 2d 567, 593 (E.D. Va. 2013) (citing 37 C.F.R. § 202.11(d)(2)) [hereinafter *Ross III*].

[7] *See Ross III*, 977 F. Supp. 2d at 593 (citing H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6951–52).

- 13 -

Copyright Office tends toward cursory issuance of registrations." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 430 (4th Cir. 2010).

The second step of the inquiry requires not only a showing that a defendant copied a plaintiff's work, but that the defendant copied "protected elements" of the plaintiff's work. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir. 2000). In the context of a copyright infringement claim, whether the copied elements of a work are protected is particularly important because "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 348 (1991). Rather, copyright protection extends "only to those components of a work that are original to the author." *Id.*

Copyright infringement may be proven through either direct evidence of copying or, as is more common, circumstantial evidence of copying. *Bldg. Graphics*, 708 F.3d at 578. Where, as here, direct evidence of copying does not exist, a plaintiff "may create a presumption of copying by indirect evidence, establishing that the defendant had access to the copyrighted work and that the defendant's work is 'substantially similar' to the protected material." *Id.* (internal citations omitted). The substantial similarity inquiry "asks whether a defendant copied the '*original* elements' of a copyright." *Universal Furniture*, 618 F.3d at 436 (quoting *Lyons*, 243 F.3d at 801). In 1977, the Ninth Circuit articulated a test for substantial similarity that bifurcates the inquiry into: (i) a test for similarity of *ideas*, labeled as the "extrinsic test," and (ii) a test for similarity in the *expression* of those ideas, labeled as the "intrinsic test." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), *superseded on*

- 14 -

*other grounds by* 17 U.S.C. § 504(b).[8] In 1990, the Fourth Circuit, in *Dawson v. Hinshaw Music Inc.*, adopted the Ninth Circuit's two-pronged extrinsic/intrinsic test for substantial similarity. 905 F.2d 731 (4th Cir. 1990). And more recently, the Fourth Circuit in 2012 has made clear that the extrinsic/intrinsic test applies specifically to infringement of copyrights in architectural works. *Ross II*, 496 F. App'x at 320. Thus, to show substantial similarity under the Fourth Circuit's formulation of the test, a plaintiff must show that two works are (1) "extrinsically similar because they contain substantially similar ideas that are subject to copyright protection" and (2) "intrinsically similar in the sense that they express those ideas in a substantially similar manner from the perspective of the intended audience of the work." *Universal Furniture*, 618 F.3d at 435.

Extrinsic similarity, the first prong of the analysis, "is an objective inquiry, which requires consideration of 'external criteria of substantial similarities in both ideas and expression.'" *Ross II*, 496 F. App'x at 318 (quoting *Universal Furniture*, 618 F.3d at 435-36). Because extrinsic similarity is an objective inquiry, it may be shown through expert testimony. *See, e.g., Universal Furniture*, 618 F.3d at 435–36; *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996). In conducting an extrinsic similarity analysis, "a court must consider whether the two

---

[8] The Ninth Circuit developed this two-pronged test to ensure that copyright infringement claims could succeed only where the allegedly copied work was deserving of copyright protection. *Krofft*, 562 F.2d at 1163. The court reasoned that if infringement could be found on a showing of access and substantial similarity, without a showing that the allegedly copied work was protectable in the first place, then copyright infringement could be found in cases where unprotectable designs were copied. *Id.* at 1162-63. In expressing this concern, the court used the example of "a cheaply manufactured plaster statue of a nude," and reasoned that "[t]he burden of proof on the plaintiff would be minimal, since most statues of nudes would in all probability be substantially similar to the cheaply manufactured plaster one." *Id.* Thus, the court devised the two-pronged extrinsic/intrinsic similarity test, in part, to limit copyright protection to the expression of protectable ideas.

works contain substantially similar *ideas that are subject to copyright protection.*" *Ross II*, 496 F. App'x. at 318 (emphasis added); *see also Universal Furniture*, 618 F.3d at 436 (noting that the extrinsic test pertains only to the "copyrightable aspects" of a work).

Whereas extrinsic similarity is an objective inquiry, intrinsic similarity is a subjective inquiry that turns on the "total concept and feel of the works, but *only* as seen through the eyes of the . . . intended audience of the plaintiff's work." *Universal Furniture*, 618 F.3d at 436 (emphasis in original). The intrinsic similarity test asks whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Id.* (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960)). Importantly, "analytic dissection of protected and unprotected elements is inappropriate under the intrinsic prong, given that the ordinary observer does not make this distinction." *Id.* at 437. And because the intrinsic similarity prong is a subjective inquiry, it generally does not involve the use of expert testimony. *See Ross II*, 496 F. App'x at 319.

### IV.

Thus, the two elements required to prove copyright infringement are (i) a valid copyright, and (ii) copying of the protectable original elements of that copyright. *Lyons*, 243 F.3d at 801. And where, as here, direct evidence of copying is lacking, a plaintiff may create a presumption of copying by showing that (i) "defendant had access to the copyrighted work," and (ii) "that the defendant's work is 'substantially similar' to the protected material." *Id.* (internal citations omitted). Therefore, analysis of whether the Two Park Crest design infringes the Grant Park copyright consists of the following inquiries: (1) whether Humphreys holds a valid copyright in the Grant Park design, (2) whether Humphreys has established that defendants had access to the Grant Park design, and (3) finally, whether the Grant Park design and the Two Park Crest design,

- 16 -

viewed through the lens of the extrinsic/intrinsic test, are substantially similar. Each of these inquiries is separately addressed.

## A. Validity

Humphreys seeks partial summary judgment on the issue of the validity of the Grant Park design copyright. *See* Rule 56(a), Fed. R. Civ. P. ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."). In response, defendants argue that summary judgment on this issue is inappropriate as genuinely disputed material facts exist bearing on the copyright's validity.

In support of its request for partial summary judgment on validity, Humphreys relies chiefly and essentially on its Certificate of Registration for the Grant Park design copyright. To be sure, Humphreys is correct that its Certificate establishes a "presumption of a valid copyright." *See Innovating Legal Mktg., LLC v. Market Masters-Legal*, 852 F. Supp. 2d 688, 698 (E.D. Va. 2012). Yet, the Certificate, by itself, does not carry the day for Humphreys, for as the Fourth Circuit has explained, "this presumption is fairly easy to rebut because the Copyright Office tends toward cursory issuance of registrations." *Universal Furniture*, 618 F.3d at 430. To rebut the presumption created by the Certificate, defendants point to abundant evidence in the summary judgment record showing that the nine individual features on which Humphreys relies for its infringement claim are not individually protectable features under the AWCPA. *See* Part IV.C, *infra.* Indeed, Humphreys does not claim otherwise. Instead, Humphreys claims that it is the arrangement of the nine individual features in the Grant Park building's design that merits AWCPA protection.

It is true that Humphreys' copyright is not invalid merely because the nine Grant Park design features on which Humphreys relies are not individually protectable; the AWCPA also

- 17 -

protects "the overall form as well as the arrangement and composition of spaces and elements in the design." 17 U.S.C. § 101. But notably, AWCPA protection does not extend to "standard configurations of spaces" and design elements that are functionally required. *See* 37 C.F.R. § 202.11(d)(2); *Ross III*, 977 F. Supp. 2d at 593. Therefore, if Humphreys' arrangement is not purely utilitarian, mandated by building code requirements or standard architectural practices, that arrangement may warrant protection under the AWCPA. In this respect, it is settled that Humphreys is "obliged to show" that the features of its design are "conceptually separable" from the design's "utilitarian aspects" in order to demonstrate the validity of its copyright. *See Universal Furniture*, 618 F.3d at 429-32.

Yet, no such showing appears in the summary judgment record. Instead, this record reflects that the arrangement of certain building features Humphreys claims warrant copyright protection–such as exit stairwells adjacent to the elevators and a service corridor connecting a mechanical/electrical room and trash chute–are attributable to building code requirements, not aesthetic considerations. Thus, the arrangement of these features in the Grant Park design is a standard configuration not protectable under the AWCPA. 37 C.F.R. § 202.11(d)(2). Indeed, Humphreys' expert acknowledged the influence of building code regulations on the Grant Park design. *See* Oral and Videotaped Deposition of Daniel Figert at 142: 4-7 ("Q. Is there any state in which an exit stairway would not be mandated by building code in a high-rise residential building? A. Not that I'm aware of. No sir."). Similarly, Humphreys' expert conceded that the Lessard defendants' placement of service corridors in the Two Park Crest design was required by Fairfax building code. *Id.* at 108: 9-12 ("Q. So Lessard really didn't have any choice; it was required to put a fire or service corridor between the two lobbies, wasn't it? A. It is a requirement of the codes."). The summary judgment record also demonstrates that Humphreys'

- 18 -

placement of the service corridors in the Grant Park design was functionally required. *See* 30(b)(6) Videotaped Deposition of Mark E. Humphreys at 187: 14-22 ("Q. Okay. Is that a yes or a no that a service corridor connecting the staircases is a code requirement? A. If I took my design to Fairfax County, it would be the same as Minneapolis. It has to be connected. Q. Because it's required by code, right? A. Well I'm doing it as a fire corridor. Yes."). This evidence confirms that Humphreys has failed to carry its burden as the movant to adduce evidence that the arrangement of features in the Grant Park design was not utilitarian in nature; indeed, Humphreys does not address defendants' argument that Humphreys' arrangement is functional in any of its supporting summary judgment materials.

Thus, Humphreys is not entitled to summary judgment on the validity of its copyright. Yet, no final ruling on the validity of Humphreys' copyright is reached here, as there are no pending summary judgment motions with respect to defendants' counterclaim that Humphreys' copyright is invalid. The only result reached here is that Humphreys is not entitled to summary judgment on the issue of the validity of its copyright.[9]

---

[9] Given the result reached here, it is also appropriate to deny Humphreys' motion for partial summary judgment with respect to defendants' counterclaims bearing on the validity of Humphreys' copyright. Specifically, Humphreys' motion for partial summary judgment is denied with respect to:

1. Lessard defendants' counterclaim seeking declaratory judgment of non-infringement, invalidity, and unenforceability.

2. Penrose defendants' counterclaim seeking declaratory judgment of unenforceability on the grounds that Humphreys' copyright only extends to standard functional features.

3. Clark's counterclaim seeking declaratory judgment of unenforceability on the grounds that Humphreys' copyright only extends to standard functional features.

4. Penrose defendants' counterclaim seeking declaratory judgment of invalidity.

## B. Access

It is settled in the Fourth Circuit that "[a]ccess may be shown by demonstrating that the infringer had an opportunity to view or to copy the protected material." *Bldg. Graphics*, 708 F.3d at 578. But importantly, "this showing must establish more than a mere possibility that such an opportunity could have arisen; it must be reasonably possible that the paths of the infringer and the infringed work crossed." *Id.* (quoting *Ale House Mgmt.*, 205 F.3d at 143). And access may be inferred if there is a reasonable possibility that the alleged infringer had access through "a third party intermediary who has a close relationship with the infringer." *Towler*, 76 F.3d at 583.

For the purposes of summary judgment, the Lessard defendants and the Penrose defendants do not dispute that they had access to the Grant Park design. Although Lessard Design and the Lessard Group do not dispute access in their motion for summary judgment, Mr. Lessard, in his separate motion for summary judgment, argues that summary judgment is appropriate for him because he did not perform any of the acts alleged to constitute copyright infringement in his individual capacity. Similarly, although the Penrose defendants do not dispute access in their collective motion for summary judgment, Sixth Penrose, in a separate motion for summary judgment, argues that, as an investment company that played no role in the design or construction of the allegedly infringing design, it cannot be found liable for infringement. In addition, the Northwestern defendants and Clark argue that they are entitled to summary judgment on the issue of access (and hence infringement) because the record reflects that they were not involved in the Two Park Crest project at the time that the allegedly infringing plans were developed. Each of these issues is addressed separately.

---

5. Clark's counterclaim seeking declaratory judgment of invalidity.

### 1. Mr. Lessard

Mr. Lessard, in a separate motion for summary judgment, argues that summary judgment is appropriate with regard to him because he individually had no access to the Grant Park design. Yet, Humphreys has proffered evidence that Mr. Lessard had an opportunity to view or copy the protected material, including: (i) the 2005 conference in Orlando, and (ii) the 2010 email from McDonald containing the Grant Park design. *See* Part I.B.5, *supra*. Although Mr. Lessard was not the lead architect on the Two Park Crest project, it is undisputed (i) that he was a majority shareholder in Lessard Urban/Design, (ii) that he worked on the project as a consultant, and (iii) that he personally guaranteed Lessard Urban/Design's performance on the project. This is evidence sufficient to create a triable issue of fact on the issue of Mr. Lessard's access to the Grant Park design. *See Towler*, 76 F.3d at 582. Accordingly, Mr. Lessard's motion for summary judgment on the ground of lack of access must be denied.[10]

### 2. Sixth Penrose

Sixth Penrose, in a separate motion for summary judgment based on lack of access, argues that as an investment company that played no role in the design or construction of the

---

[10] Nor is Mr. Lessard entitled to summary judgment because he did not personally perform any of the acts alleged to constitute direct infringement. A defendant who cannot be held liable for acts of direct infringement may nonetheless be liable for infringement on theories of vicarious liability or contributory infringement. Vicarious liability requires a showing that the defendant: "(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002). In addition, under a contributory infringement theory, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another" is also liable for the infringement. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (quoting *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971)). The summary judgment record does not foreclose liability against Mr. Lessard on these theories and hence his motion for summary judgment on these grounds must be denied at this time.

allegedly infringing design, it cannot be found liable for infringement. Humphreys responds that there is a genuine issue of material fact on whether Sixth Penrose may be held vicariously liable for copyright infringement.

Although there is no Fourth Circuit authority on when a parent company may be held vicariously liable for copyright infringement by a subsidiary, persuasive authority from other circuits holds that a parent company is vicariously liable for the infringing acts of a subsidiary where there is "a substantial and continuing connection between the two with respect to the infringing acts." *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1553 (9th Cir. 1989); *see also Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1518 (11th Cir.1990). In other words, for vicarious liability to attach, the parent must supervise and have a financial interest *specifically* in the infringing activity. Humphreys has proffered sufficient evidence to create a triable issue of fact on this issue.

It is undisputed that Sixth Penrose is a single purpose entity formed solely as an investment vehicle for Two Park Crest. As the 70% investor and Manager of PDT, Sixth Penrose was able to supervise and control PDT, and Sixth Penrose's corporate representative testified accordingly. *See* Plaintiff's Opposition to Defendant Sixth Penrose Investing Company LLC's Motion for Summary Judgment, Doc. 254, Ex. A. at 183:18-184:10 ("[I]n PDT Sixth Penrose is a manager . . . [i]f you read the PDT Operating Agreement or when you read it, you will see that we are the manager . . . ."). Thus, Sixth Penrose has an obvious supervisory role

over and financial interest in the Two Park Crest project. Accordingly, Sixth Penrose's separate motion for summary judgment must be denied.[11]

### 3. Northwestern Defendants

The Northwestern defendants argue that they are entitled to summary judgment because they executed a binding contract to purchase Two Park Crest in December 2010, a month after The Penrose Group had hired Lessard Urban/Design on November 17, 2010, and that the purchase included the architectural plans prepared by Lessard Urban/Design. Humphreys responds that there is adequate evidence that the Northwestern defendants had access to the Grant Park design through its third-party intermediary The Penrose Group.[12]

The summary judgment record reflects that the Northwestern defendants were engaged in negotiations to purchase Two Park Crest during the same time period—October 2010 through January 2011—that The Penrose Group was soliciting design bids and ultimately selecting Lessard Urban/Design as the architect for Two Park Crest. And in January 2011, both (i) Northwestern Mutual's acquisition of Two Park Crest and (ii) Northwestern Investment's contract with Lessard Urban/Design were finalized. These events and the close business relationship between the Northwestern defendants and the Penrose defendants is sufficient to

---

[11] Sixth Penrose also argues that there is no basis for piercing the corporate veil to hold it liable for PDT's actions. Yet, the cases Sixth Penrose cites do not arise in the copyright infringement context. Moreover, because other circuits have persuasively articulated the "substantial and continuing connection" test specifically in the context of copyright infringement, Sixth Penrose's reliance on a veil-piercing argument is unpersuasive; veil piercing is not required to hold a parent liable for its subsidiary's acts of copyright infringement.

[12] Humphreys also argues that even if access is not established, the Northwestern defendants may nonetheless be held liable because (i) they purchased an infringing design and proceeded with the project development, and (ii) they are subject to vicarious liability. Because there is a triable issue of fact on access by the Northwestern defendants, summary judgment must be denied and these alternative theories of liability need not be addressed.

create a triable issue of fact on whether the Northwestern defendants had access to the Grant Park design through its third-party intermediary, The Penrose Group. *See Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 354 (4th Cir. 2001) (finding sufficient evidence for a finding of intermediary access where the alleged infringer shared office space with someone with access to the protected design).[13] This is so because a "copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere opportunity to see the work." *Id.* at 354-55. Thus, the record reflects that there is a triable issue of fact on whether the Northwestern defendants had the requisite access to the Grant Park design and hence the Northwestern defendants' separate motion for summary judgment must be denied.

### 4. Clark

In its separate motion for summary judgment, Clark argues that because it was hired to construct Two Park Crest months after the architectural designs for the project were finalized, there is no evidence that Clark had access to the Grant Park design and thus Clark cannot be liable for infringement. Humphreys responds that, as with the Northwestern defendants, there is adequate evidence that Clark had access to the Grant Park design through its third-party intermediary The Penrose Group, and that even without access, Clark could be held liable for direct infringement for constructing an infringing building.[14] It is undisputed that the schematic

---

[13] *See also T-Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97, 111 (1st Cir. 2006) ("A trier of fact may impute access when there is evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work, and the plaintiff's and defendant's dealings took place concurrently.").

[14] Humphreys does not allege or pursue liability against Clark under a vicarious or contributory infringement theory. In any event, as Clark was only involved in the construction of the

design phase for Two Park Crest was complete by January 19, 2011, and that Clark and Northwestern Mutual entered into the Prime Contract on November 23, 2011—ten months after the building design had been completed. It is also undisputed that at the time that Clark entered into the Prime Contract and began excavation at the construction site, architectural drawings and plans had already been submitted to Fairfax County for approval. There is no evidence in the record indicating that any of the other defendants shared any Grant Park design information with Clark. In that respect, this situation is remarkably similar to *Ross III*, where the court found that a party that was "only involved in the construction" of the building at issue did not have intermediary access to the relevant design, as it was in a "purely contractual" relationship insufficient to evidence a "more intimate association" for a finding of access through an intermediary. *Ross III*, 977 F. Supp. 2d at 589.

As the Fourth Circuit noted in *Towler*, the record must show that "it must be reasonably possible that the paths of [the alleged infringer–here Clark] and the [allegedly infringed design–here Grant Park] crossed." *Towler*, 76 F.3d at 582. That evidence is absent from this record. Nor do the cases cited by Humphreys—which Humphreys contends show that courts routinely hold contractors liable for copyright infringement—compel a contrary conclusion. These cases are neither apposite nor controlling.[15] Accordingly, Clark's motion for summary judgment based on lack of access must be granted.

---

building, Clark lacked any sort of "close relationship" with any of the other defendants to be liable under any sort of indirect infringement theory. *Ross III*, 977 F. Supp. 2d at 589.

[15] *See T-Peg*, 459 F.3d at 111 (finding that access may be inferred where there is "evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work, and the plaintiff's and defendant's dealings took place concurrently"); *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998) (affirming district court's determination that there was no implied license granted to contractor); *Monterey Bay Homes, LLC v. Chambers*, 4:12-CV-00891,

### 5. Humphreys' Access to the Harbor Towers Design

A further access issue exists not with regard to defendants' motion for summary judgment, but in connection with Humphreys' motion for partial summary judgment with respect to the Lessard defendants' counterclaim that Humphreys' Grant Park design infringes the Lessard defendants' copyrighted Harbor Towers design. More specifically, the Lessard defendants claim that the Grant Park design is substantially similar to the Harbor Towers design and that Humphreys had the requisite access to the Harbor Towers plans. For access, the Lessard defendants rely on the fact that Mark Humphreys attended a September 6, 2001 Architectural Design Trends conference which featured as a speaker Robert Swedroe, the architect who created the Harbor Towers design. In response, Humphreys argues that the summary judgment record makes clear that the Harbor Towers design was not disclosed at the September 6, 2001 conference, and hence, the record falls far short of showing that the Lessard defendants can establish by a preponderance of the evidence, as required by the Supreme Court,[16] that Humphreys had the necessary access to the Harbor Towers design. An examination of the summary judgment record confirms that Humphreys' contention is correct.

To begin with, the summary judgment record makes clear that the Harbor Towers plans were not exhibited or disclosed at the September 6, 2001 conference. Thus, Robert Swedroe testified that not a single photograph of the Harbor Towers design was included in the slides he presented, nor was a floor plan of the Harbor Towers design included. *See* Memorandum in

---

2014 WL 1314241 (D. S.C. Mar. 31, 2014) (denying builder's motion for summary judgment only after access was established).

[16] *See Anderson*, 477 U.S. at 252 (noting that the nonmovant cannot rely on "the mere existence of a scintilla of evidence" to survive summary judgment, and that there "must be evidence on which the jury could reasonably find for" the nonmovant.)

Support of Plaintiff's Motion for Partial Summary Judgment, Doc. 215, Ex. H at 70:10-11

("There's no floor plan from Harbor Tower II if that's your question."); 69:18-21 (conceding that

there was not a "single photograph" of the Harbor Towers design in the slides presented at the

conference.) Indeed, Mr. Swedroe testified that he was not even sure that he mentioned the

Harbor Towers design at the September 6, 2001 conference. *See id.* at 59:3-4 ("Well, I don't

know that I mentioned buildings by name . . ."). Instead, the uncontradicted summary judgment

record reflects that Mr. Swedroe simply addressed the audience about design concepts at a high

level of generality; he did not specifically discuss the Harbor Towers design. For example, when

Mr. Swedroe discussed connecting two core elevators with a fire or service corridor, his remarks

were limited to the benefits of the concept in the abstract, noting that "The objective is to

maximize the salable area and minimize the gross area." *Id.* at 61:1-5. Importantly, Mr.

Swedroe admitted that it was "possible" he did not even mention the Harbor Towers design in

connection with his presentation at the conference. Lessard Defendants' Opposition to

Plaintiff's Motion for Partial Summary Judgment, Doc. 260, Ex. E at 71:8-14. Moreover, Mr.

Swedroe commented that the purpose of his presentation was not to analyze or disclose a specific

building design, but only to mention creative ideas broadly to help developers. *Id.* at 63:17-20.[17]

   Thus, the summary judgment record makes clear that the Lessard defendants have fallen

short of adducing evidence from which a reasonable trier of fact could find, by a preponderance

of the evidence, that Humphreys had "an opportunity to view or copy" the Harbor Towers

---

[17] The Lessard defendants also argue that since Mark Humphreys prepared his initial floor plan
drawing of the Grant Park design less than three weeks after attending the conference with Mr.
Swedroe, Humphreys must have necessarily copied the Harbor Towers design. This argument is
unpersuasive; temporal proximity is too slim a reed to support an inference of either access or
copying.

design. *Bldg. Graphics*, 708 F.3d at 577.[18]  Although the paths of Mark Humphreys and Robert

Swedroe crossed, this crossing was too fleeting and lacking in substantive disclosure of the

Harbor Towers design to support an inference of access.  It follows that summary judgment in

favor of Humphreys is appropriate with respect to the Lessard defendants' counterclaim that

Humphreys' Grant Park design infringes the Harbor Towers design.

### C. Substantial Similarity

Humphreys asserts that the Grant Park and Two Park Crest designs are substantially

similar because they share the following nine features:[19]

1.  a high-rise residential building;

2.  two elevator cores connected by a fire or service corridor;

3.  direct access from the residential units to an elevator lobby;

4.  a barbell-shaped floor plan;

5.  a mechanical/electrical room space at one end of the service corridor and a trash chute at the other end;

6.  exit stairwells adjacent to the elevators;

7.  corner units with diagonal entry access;

8.  alternating vertical elements; and

9.  projecting elements at the cornice of the roof line.

---

[18] Given the lack of a triable issue of fact as to whether Humphreys had access to the Harbor Towers design, it is unnecessary to decide whether the Harbor Towers design and Grant Park design are substantially similar.

[19] *See* Expert Report of Daniel W. Figert [hereinafter "Figert Report"] at 6-8.

The parties dispute whether the Grant Park and Two Park Crest designs are substantially similar. And it is this dispute that must now be addressed.

### 1. Extrinsic Similarity

To begin with, the parties disagree over how to conduct the extrinsic similarity inquiry. Humphreys argues that courts should not examine whether specific features of a work are protectable, but rather should ask only whether the work in its entirety—here, the building design—is protectable.   Otherwise, Humphreys argues, "it would be hard to find any valid copyright, because most works are made up of individual elements that are not protected by copyright." Plaintiff's Opposition to Lessard Defendants' Motion for Summary Judgment that the Park Crest Two Design was Not Copied and There is No Basis for Recovery of Defendants' Profits, Doc. 263 at 25.   To support its argument, Humphreys opines that architecture is like poetry or a musical composition and as such, although individual words or musical notes are not copyrightable, the arrangement of those words or musical notes is. *Id.* at 25-26.   Defendants disagree, arguing that Fourth Circuit authority requires that courts determine whether the individual features of an architectural work are protectable because copyright infringement can only be found where a defendant copied protectable elements of a plaintiff's work. *See Ross II*, 496 F. App'x. at 318. Defendants also contend that where, as defendants contend is true here, the Grant Park design is comprised solely of nonprotectable features, plaintiff must meet a higher "supersubstantial similarity" standard.

Neither party has it quite right.   Although there is some support for defendants' "supersubstantial similarity" standard in other circuits, there is no warrant for the application of

this principle in the Fourth Circuit.[20] And Humphreys' proffered summary judgment standard fails because it does not allow for a rigorous determination of whether there is a triable issue of fact on whether a defendant has infringed the *protectable* elements of Humphreys' design.   In sum, to conduct the extrinsic prong of the substantial similarity inquiry properly, the elements or features of a given design must first be disaggregated to determine whether each individual element or feature is protectable.   And then, if necessary, it must be determined whether the overall arrangement of those elements warrants copyright protection under the AWCPA. The AWCPA and Fourth Circuit precedent confirm that this is the appropriate manner to conduct the extrinsic prong of the substantial similarity analysis.

---

[20] The Eleventh Circuit applied this principle, *i.e.* that where copyrights in architectural works are "thin" compilations, a showing of "supersubstantial similarity" is required to show infringement, and a court in this district adopted the principle in 2011. *See Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC*, 827 F. Supp. 2d 607, 620 (E.D. Va. 2011), *vacated on other grounds*, 496 F. App'x 314 (4th Cir. 2012) (citing *Intervest Const., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 919 (11th Cir. 2008)) [hereinafter *Ross I*]. Humphreys argues that the Fourth Circuit implicitly rejected the supersubstantiality requirement when it vacated and remanded the district court's holding in *Ross I* because it found that the district court had incorrectly applied the Second Circuit's "more discerning observer" test rather than the two-part inquiry into "extrinsic" and "intrinsic" similarity. *See Ross II*, 496 F. App'x at 319. Defendants argue that the Fourth Circuit's opinion in *Ross II* does not address the supersubstantial similarly principle articulated by the district court, and thus that portion of the district court's opinion remains intact.   Indeed, the Fourth Circuit made clear that it did *not* consider the supersubstantiality requirement in its holding:

> [I]n view of our holding, we need not consider Charles Ross' argument that the district court erred in concluding that the [copyright design] was entitled to only a lesser, "thin" degree of copyright protection . . . . These factors should be considered by the district court in the first instance within the framework of this Court's two-part test for determining substantial similarity.

*Id.* at 321. Nor has the Fourth Circuit since *Ross II* addressed whether the supersubstantial similarity requirement applies in this circuit.

Congress crafted the AWCPA and its implementing regulations to protect "the overall form as well as the arrangement and composition of spaces and elements in the design,"[21] while excluding from copyright protection "individual standard features,"[22] "standard configurations of spaces,"[23] and functionally required elements.[24] As such, Congress recognized that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of [non-protected] elements into an original, protectable whole." *Ross II*, 496 F. App'x at 317 (quoting H.R. Rep. No. 101–735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6949). At the same time, Congress sought to protect only those "features [of architectural works] that reflect the architect's creativity," while excluding from the Copyright Act any unoriginal features, the protection of which "would impede, rather than promote, the progress of architectural innovation." *Ross III*, 977 F. Supp. 2d at 593 (quoting H.R. Rep. No. 101–735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6952).

The Supreme Court has made this point clear, noting that "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected," and that "copyright protection may extend only to those components of a work that are original to the author." *Feist*, 499 U.S. at 348. Fourth Circuit precedent has similarly emphasized these points. In *Ross II*, 496 F. App'x at 318, the Fourth Circuit made clear that: "In conducting this objective [extrinsic similarity] inquiry, a court must consider whether the two works contain substantially

––––––––––––––––––––

[21] 17 U.S.C. § 101.

[22] *Id.*

[23] *Ross III*, 977 F. Supp. 2d at 593 (citing 37 C.F.R. § 202.11(d)(2)).

[24] *Id.* (citing H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6951–52).

similar ideas that are subject to copyright protection." *See also Universal Furniture*, 618 F.3d at

436 (noting that the extrinsic test pertains only to the "copyrightable aspects" of a work); *Lyons*,

243 F.3d at 801 ("First, the court must determine whether the two works are extrinsically similar

because they contain substantially similar ideas that are subject to copyright protection.").[25]

Thus, in conducting an extrinsic similarity analysis, "a court must consider whether the two

works contain substantially similar *ideas that are subject to copyright protection.*" *Ross II*, 496

F. App'x. at 318 (emphasis added).  And because only "ideas that are subject to copyright

protection" should be considered in the infringement analysis,[26] a court must "first determine the

extent and scope of copyright protection" for the copyrighted design, and then "the court can

assess whether [the protectable elements of the copyrighted design] are substantially similar to

the ideas contained in the [allegedly infringing] design." *Ross III*, 977 F. Supp. 2d at 592; *see

also Logan Developers, Inc. v. Heritage Bldgs., Inc.*, 7:12-CV-323-F, 2014 WL 2547085 (E.D.

N.C. June 5, 2014) ("[T]he court must first identify the protected aspects of [the copyrighted]

design and compare only those elements with the corresponding elements in [the allegedly

infringing] design.").

      Thus, it is clear that in making an extrinsic similarity determination at the summary

judgment stage, the individual elements of an architectural design must first be disaggregated to

---

[25] Contrary to Humphreys' argument, when the Fourth Circuit held in *Ross II* that the district court erred in segregating protected from non-protected features, the court was not referring to the extrinsic similarity inquiry, but was instead solely referring to the intrinsic similarity inquiry. This is confirmed by the following excerpt from *Ross II*: "Thus, in segregating these non-protected similarities, the district court deviated from the essential principle of the *intrinsic component* of our two-part test, namely, that a court is not to set out to detect the disparities, or engage in analytic dissection of protected and unprotected elements." *Ross II*, 496 F. App'x at 320 (emphasis added) (internal quotation marks omitted).

[26] *Ross II*, 496 F. App'x. at 318.

determine whether each of those elements, viewed in isolation, is protectable under the AWCPA. Then it must be determined whether a reasonable jury could find those disaggregated elements to be extrinsically similar in the protected and allegedly infringing designs. Indeed, Humphreys itself disaggregates the designs, asserting that the Two Park Crest design infringes its Grant Park design because the designs share nine individual features. Of course, it is possible that an architectural work that contains solely standard design features is nonetheless protectable because those standard design features are arranged in an original and nonstandard manner.[27] Thus, after the individual elements are disaggregated, it must be determined whether "the overall form as well as the arrangement and composition of spaces and elements,"[28] in the Grant Park design is protectable under the AWCPA, and whether a reasonable jury could find that overall arrangement extrinsically similar in the Grant Park design and the Two Park Crest design.

### (a)  *A high-rise residential building*[29]

First, there is no dispute that a high-rise residential building is a "standard" feature under the AWCPA. 17 U.S.C. § 101. Numerous high-rise residential buildings are found all across the United States. To grant copyright protection to a feature as prevalent as a high-rise residential building would create an unjustified monopoly, and "impede, rather than promote, the progress of architectural innovation." *Ross III*, 977 F. Supp. 2d at 593. And indeed, Humphreys does not

---

[27] *See Universal Furniture*, 618 F.3d at 430 ("The mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that the combination of such component parts as a separate entity is both original and copyrightable.") (internal citation and quotation marks omitted).

[28] 17 U.S.C. § 101.

[29] *See* Appendix C.

argue that the concept of a high-rise residential building, by itself, is deserving of copyright protection. Accordingly, the concept of a high-rise residential building is not protectable.

Moreover, the Grant Park design and Two Park Crest design execute the high-rise concept differently. Humphreys' sole evidence to the contrary on this point is that "[b]oth building designs are approximately twenty stories tall, and both are designed as multi-family residential projects." Figert Report at 6.[30] This evidence is hardly probative on the extrinsic similarity of the two buildings; indeed, this is tantamount to stating that palm trees and oak trees are substantially similar merely because both are trees and both are relatively tall. Moreover, the undisputed evidence in the record demonstrates that the two buildings are quite different in size. The Grant Park building is 27 stories tall, whereas the Two Park Crest building has a height of just 19 stories. The buildings also contain floors of different proportions, with the length of a typical floor in Grant Park being 237 feet versus a mere 221 ½ feet in Two Park Crest. And because Grant Park features larger condominiums while Two Park Crest contains smaller rental units, Grant Park has 11 units on a typical floor compared to the 17 units on a typical floor in the Two Park Crest building. Gresham Report at 15; Expert Report of Lessard Defendants' Expert Robert Greenstreet [hereinafter "Greenstreet Report"] at 11.

Accordingly, the concept of a high-rise residential building, by itself, is not protectable under the AWCPA because it is a "standard" feature under the AWCPA. Further, based on the

---

[30] It should be noted that it appears that Humphreys' expert's report mistakenly refers to the alleged extrinsic similarities as "intrinsic conclusions and observations." Figert Report at 6. This error is not the seven-page report's sole failing. In general, the report is wholly inadequate to support Humphreys' contentions of copyright infringement at the summary judgment stage, as the report simply parrots Humphreys' arguments in its complaint as to which features Humphreys believes deserve protection, without substantively comparing the two designs at issue and taking account of their differences and similarities.

summary judgment record, no reasonable jury could conclude that in this respect–high-rise residential buildings–the Grant Park and Two Park Crest high rise designs are extrinsically similar.

### (b) *Two elevator cores connected by a fire or service corridor*[31]

Humphreys next claims that Grant Park and Two Park Crest have in common the feature of a building with two elevator cores that are connected by a fire or service corridor, rather than a hallway designed for use by residents. This feature, by itself, does not warrant copyright protection and Humphreys does not contend otherwise. Indeed, the uncontroverted record establishes that the use of multiple elevator cores that provide units with direct access to elevator lobbies "is a well-known design idea or concept," and thus standard. Expert Report of Lessard Defendants' Expert Douglas N. Carter [hereinafter "Carter Report"] at 10. At least one housing design textbook expressly states that "[i]n extremely long buildings, it is not unusual to have two independent elevator cores." Gresham Report at 9. Further, the uncontroverted record also reflects that apartment buildings with multiple elevator cores connected by fire or service corridors are quite common, including the Dorilton in New York, which was built in 1902; the Immeuble Clarté in Geneva, which was built in 1932; the Beacon Street Apartments in Boston, which were built in 1959; the 2500 Peachtree Condominiums in Atlanta, which opened in 2000; and Harbor Towers in Dade County, Florida, which was built in 1993. Gresham Report at 9-12. The record also shows that the Harbor Towers design, in particular, offers "clear evidence" that the idea of "two circulation cores connected by an isolated fire/service corridor pre-dates the work of Humphreys & Partner architects." *Id.* at 12. Thus, as an individual feature, the concept

_____

[31] *See* Appendix D.

of dual elevator cores connected by a fire or service corridor is a standard feature, ineligible for copyright protection under the AWCPA.

Even if the two elevator core concept merited copyright protection, Humphreys has not proffered evidence that would permit a reasonable jury to conclude that the dual elevator core concept is extrinsically similar in the Grant Park design and the Two Park Crest design. Humphreys' sole evidence in this respect is a conclusory statement that both designs contain the dual elevator core element, with no substantive comparison of each design's elevator cores. Figert Report at 6. Indeed, such a comparison is instructive. The Two Park Crest design actually has three elevator cores, not two, as a service elevator is included that can be accessed from the fire corridor, making this feature in the Two Park Crest design significantly different from the feature in the Grant Park design. Gresham Report at 15. On this record, therefore, a reasonable jury could not conclude that the elevator core feature in the Grant Park design is extrinsically similar to the feature in the Two Park Crest design.

(c) *Direct access from the residential units to an elevator lobby*[32]

The undisputed summary judgment record similarly shows that the concept of direct access from residential units to an elevator lobby, as opposed to residential units that are accessed from a hallway, is a well-established standard feature not protectable under the AWCPA. It is uncontradicted in this record that, as one of defendants' expert's reports (unrebutted) notes, in buildings where developers seek to provide a greater level of intimacy for residents, "providing direct access to the lobby from the residential units is a well-known and standard feature." Carter Report at 13. In addition to the fact that direct access is a standard

---

[32] *See* Appendix E.

architectural feature undeserving of copyright protection, it is also true that no reasonable jury could find, based on the summary judgment record, that the direct access featured in the Two Park Crest design is extrinsically similar to the direct access in the Grant Park design. Once again, Humphreys' expert merely conclusorily states that both designs have this feature, but provides no concrete comparison of the feature as implemented in the two designs. *See* Figert Report at 6. Yet, here again, the record contains an undisputed and instructive comparison. The respective floor plans in the summary judgment record, coupled with defendants' unrebutted expert reports, make clear that the direct access concept in Grant Park consists of open lobbies clustered around a central public lobby, rather than a corridor. Gresham Report at 16. By contrast, at Two Park Crest, "[u]nit entries are tucked away in the legs of an H-shaped resident corridor, creating a more private entrance experience to the unit – the 'elevator lobby' is visually separate from the resident corridors," resulting in only two of seventeen resident doors being visible from the elevator lobby. *Id.* Additionally, the elevator lobbies in the Two Park Crest design are connected to many more units than the elevator lobbies in the Grant Park design, a consequence of Two Park Crest being a rental building, and having far fewer units per floor than Grant Park. Greenstreet Report at 13.

In sum, not only is direct access a standard feature ineligible, by itself, for copyright coverage under the AWCPA, but additionally, no reasonable jury could find, based on the record, that the Grant Park and Two Park Crest designs implement direct access in an extrinsically similar manner.

### (d) *A barbell-shaped floor plan*[33]

There is no dispute that a barbell-shaped floor plan, by itself, is a standard unprotectable feature under the AWCPA. A floor plan that is thicker on the ends and thinner in the middle is standard and driven by functional considerations. As one of defendants' experts states:

> The effort to maximize rentable or salable unit spaces usually results in an arrangement of units around a central core or corridor. A minimum of two stairs per floor is required by building code, and they must be separated a minimum distance from one another. Due to these non-optional building code requirements, the layout in a multi-core building is usually some subtle variation of a "barbell" with stairs and elevators connected by a corridor.

Gresham Report at 7. Indeed, this influence of building code requirements on the Grant Park design is one of the reasons for the denial of Humphreys' motion for partial summary judgment on the validity of its copyright. *See* Part IV.A, *supra*.

Additionally, a comparison of the two buildings' respective layouts make clear that no reasonable jury could find that the floor plans of the Grant Park design and the Two Park Crest design are extrinsically similar. In fact, it is the Two Park Crest design which is "more legitimately described as a 'barbell,'" as it is more symmetrical along both axes, while the Grant Park design is less noticeably barbell-shaped. Gresham Report at 15. In addition, the center section of the Two Park Crest building, as the uncontradicted record shows, is substantially narrower than the center of the Grant Park building. *Id.* Although in a broad sense both designs may be said to have barbell-shaped floor plans, this is not the end of the inquiry. As one expert noted, a more discerning examination of the Grant Park design's floor plan shows that it is "substantially rectangular," differentiating it from the Two Park Crest design, which is more clearly barbell-shaped. Carter Report at 9. In sum, a barbell-shaped floor plan is a standard

---

[33] *See* Appendix F.

feature under the AWCPA and hence, by itself, is not protectable, given that it is a necessary layout based on building code requirements. Moreover, even assuming the Grant Park design utilizes a barbell-shaped design, no reasonable jury could find that the floor plans of the Grant Park design and Two Park Crest design are extrinsically similar.

(e) *A mechanical/electrical room space at one end of the service corridor and a trash chute at the other end*[34]

Humphreys acknowledges that mechanical/electrical rooms and trash chutes are standard features "typically included in all multifamily projects"[35] and usually required by building codes. Thus this feature, viewed individually, is not protectable under the AWCPA. Indeed, in a building design that contains two cores connected by a hallway and must contain a trash chute and a mechanical/electrical room on each floor, there is little choice other than to place those components at the ends of the service corridor. Clearly, as the undisputed record reflects, this feature is "not original in either form or arrangement." Carter Report at 9. In fact, "it is hard to conceive of a high-rise residential building meeting its functional and legal requirements" without a mechanical/electrical room and a trash chute connected by a service corridor. Greenstreet Report at 13. Even assuming a jury could find the location of the trash chute and mechanical/electrical rooms to be extrinsically similar in the Grant Park and Two Park Crest designs, this design element is entirely utilitarian in nature, and hence is unprotectable under the AWCPA. *See* Part IV.A, *supra*.

---

[34] *See* Appendix G.

[35] Figert Report at 7.

### (f) *Exit stairwells adjacent to the elevators*[36]

Similarly, there is no dispute that locating exit stairwells adjacent to elevators is a standard feature not protectable under the AWCPA. The record reflects that building codes require that all high-rise buildings have at least two means of egress via stairways, making exit stairwells yet another functional element not protectable under the AWCPA. Gresham Report at 9.[37] And, given that building code regulations require one exit stairwell per building core[38] and that both buildings consist of two cores connected by service corridors, the decision to locate those exit stairwells adjacent to the elevators is also purely functional and hence not protectable under the AWCPA. Humphreys concedes that this feature is present because "[p]rojects of this type are required to contain two exit ways." Figert Report at 7. As a result, Humphreys' inclusion and placement of exit stairwells was solely for compliance with building code regulations, making this individual feature unprotectable. *See* Part IV.A, *supra*.

Furthermore, the exit stairwells in the Two Park Crest and Grant Park designs are implemented differently. In the Grant Park design, the exit stairwells are located behind the elevator lobbies and are on the same side of the lobbies as the elevators. By contrast, in the Two Park Crest design, the exit stairwells are opposite the elevators in the elevator lobbies, and are enclosed in a separate fire-rated enclosure. Carter Report at 14; Gresham Report at 23. Consequently, not only is the arrangement of the exit stairwells itself not protectable, as it is

[36] *See* Appendix H.

[37] Humphreys did not file a rebuttal report to the Gresham Report nor dispute its content.

[38] Gresham Report at 9.

dictated by building code requirements, but additionally, no reasonable jury could find that the exit stairwells in the Two Park Crest and Grant Park designs are extrinsically similar.

### (g) *Corner units with diagonal entry access*[39]

Humphreys' next claim is that the Two Park Crest and Grant Park designs share the feature of aligning an entrance hallway along a diagonal rather than parallel to the unit walls. Once again, this is a feature that is standard and functional and hence does not itself warrant protection under the AWCPA. Humphreys does not challenge this. And, the undisputed record includes various architectural references which describe diagonal entries as a standard building feature. Gresham Report at 22; Carter Report at 9, 11, 14. Defendants' expert Gresham has used this feature "frequently" in his practice. Gresham Report at 22. This is particularly true with respect to multifamily buildings where there is a public lobby or corridor with units on both sides, because tenants typically prefer that the windowed wall be in a public space like a living room rather than a bedroom. *See* Gresham Report at 22-23. The use of diagonal entry access to corner units is a commonplace method of configuring a corner unit in a double-loaded corridor building, and solves a universal problem common to many apartment or condominium projects. *Id.* at 22.

Even if diagonal entry hallways were a protectable feature under the AWCPA, no reasonable jury could find that the unit entry hallways in Grant Park and Two Park Crest are extrinsically similar. Most entry hallways in Two Park Crest are not in fact diagonal; they are orthogonal (parallel to the front and back of the building), making the entrance halls more defined and maximizing unit privacy. Gresham Report at 23. The entrances and entry doors in

---

[39] *See* Appendix I.

the Grant Park design, by contrast, are positioned into individual units on a diagonal, making each unit feel larger. The divergent entrance placements in the Grant Park and Two Park Crest designs in their respective diagonal corridors have a significant impact on making the look and feel of the units in each design "very different." *Id.* Thus, corner units with diagonal entry access are standard unprotectable features under the AWCPA, and no reasonable jury could find that the diagonal entry access in the Grant Park design and Two Park Crest design are extrinsically similar.

### (h) *Alternating vertical elements*[40]

Humphreys does not argue that the idea of alternating vertical elements—*i.e.* various vertical features, such as columns, stacks of windows, bays, or stacked balconies, that are arranged to give a building the appearance of vertical stripes—is a protectable individual feature. Indeed, undisputed record evidence from defendants' experts makes clear that alternating vertical elements are a standard feature, "inherent [in] all but a small number of high-rise buildings." Carter Report at 11, 15; *see also* Greenstreet Report at 14 ("Tall, multi-unit buildings are likely to have a vertical emphasis, which can be expressed in various materials and will be punctuated by windows and possibly balconies."). It follows that the alternating vertical elements feature does not warrant protection under the AWCPA.

Nor could a jury find that the two designs' vertical elements are extrinsically similar. It is uncontradicted on this record that the Grant Park design's vertical bays are closely spaced, emphasizing the center of the building, while the Two Park Crest design has vertical bays that are more widely spaced, placing emphasis on separated vertical masses. Gresham Report at 19.

---

[40] *See* Appendix J.

- 42 -

Also uncontradicted is that the two designs express their respective vertical elements differently, because the Grant Park design has a decidedly postmodern influence, in contrast to the Two Park Crest design, which is detailed in a much more contemporary way. *Id.* at 21. These divergent approaches have produced significant differences in the designs' vertical elements. For example, the Two Park Crest building has a substantial glass area on its façade, something the Grant Park building lacks. Carter Report at 15. Moreover, the Two Park Crest building is missing a number of walkable balconies and individual window elements which are both present in the Grant Park design's exterior. *Id.* And the Grant Park design has large windows and protruding bays on each side of the building, as opposed to the Two Park Crest design, which appears flatter and more streamlined. Greenstreet Report at 14. Finally, the Two Park Crest design has a stepped-back upper floor and roof, which is a feature noticeably absent from the Grant Park design's vertical elements. Because of these individual differences, stemming from the different styles present in each design, no reasonable jury could conclude that the vertical elements in the Grant Park design and Two Park Crest design are substantially similar.

### (i) *Projecting elements at the cornice of the roof line*[41]

Humphreys next points to a feature described as a "projected, cantilevered element in the cornice at the roof line." *See* Amended Complaint, Doc. 21 ¶ 25. This element, by itself, is not protectable under the AWCPA because the undisputed summary judgment record shows that it is a standard feature that has been used at the cornice of roof lines since the time of the Greeks. Carter Report at 11 ("The Greeks should have claimed that copyright 3,000 years ago"), 15; Greenstreet Report at 14; Gresham Report at 22. The cantilevered cornice element in the Grant

---

[41] *See* Appendix K.

- 43 -

Park design is virtually identical to those used in classical architecture, but simplified and exaggerated to reflect the postmodern influence on the design. Gresham Report at 22. These elements have been used by architects for "millennia." Carter Report at 15.

Even assuming cantilevered overhangs are a protectable feature, defendants' experts' reports, which Humphreys does not contest, show that the Two Park Crest building's overhang is not substantially similar to the Grant Park building's overhang, as the Two Park Crest building's overhang does not qualify as "cantilevered." Gresham Report at 22. In any event, as the uncontroverted Gresham Report notes:

> Whatever they are named, the architectural elements at the cornice line of the two designs are not similar. The dominant roof form at Grant Park is a series of layered flat roofs, each with a parapet and treated with an exaggerated cornice. Two Park Crest features roof elements with step back from the façade to two central masses, each with a visible "shed roof" sloped in a single direction.

*Id.* Thus, no reasonable jury could find that the elements at the cornice of the roof line in the Grant Park design and the Two Park Crest design are extrinsically similar, even if they were protectable under the AWCPA.

### (j) *Overall arrangement of elements*

In sum, viewed individually none of the nine asserted features Humphreys relies on for copyright protection is individually protectable, nor are any of the claimed features, when viewed in isolation, extrinsically similar in the Grant Park and Two Park Crest designs. This does not end the extrinsic prong of the substantial similarity analysis; the question remains whether "the arrangement and composition of spaces and elements in the [Grant Park] design" is protectable and whether that arrangement is substantially similar to the arrangement and composition of spaces and elements in the Two Park Crest design. *See* 17 U.S.C. § 101. In other words, notwithstanding the fact that the nine features Humphreys relies on do not warrant

protection under the AWCPA, the question remains whether "the arrangement and composition of spaces and elements" is protectable and extrinsically similar in the Grant Park and Two Park Crest designs. *See id.*

Humphreys' argument in this regard, distilled to its essence, is that through combining nine unprotectable features and arranging those features in an original manner, the *arrangement* of those features is protectable, and the *arrangement* of those features is substantially similar in the Grant Park and Two Park Crest designs. This argument, closely examined, is unpersuasive. To be sure, it is true that the AWCPA protects "the overall form as well as the arrangement and composition of spaces and elements in the design." 17 U.S.C. § 101. But importantly, "standard configurations of spaces"[42] and design elements that are functionally required[43] are explicitly excluded from copyright protection. Humphreys' choice to combine direct access elevator cores—a standard feature—with other standard features such as diagonal unit entrances, trash chutes, and exit stairwells, is a standard configuration attributable in large measure to building code requirements. *See* 37 C.F.R. § 202.11(d)(2). Moreover, as the Greenstreet report reflects, Humphreys' design has organized the elements in "predictable, conventional spatial configurations that can be seen in comparable buildings." Greenstreet Report at 10. Humphreys' arrangement is also unsuitable for copyright protection because the design is wholly utilitarian in nature. This is because, as discussed in Part IV.A, *supra*, building codes and permits create an extremely limited number of ways in which those features can be arranged

---

[42] 37 C.F.R. § 202.11(d)(2).

[43] *Ross III*, 977 F. Supp. 2d at 593 (citing H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6951–52).

relative to one another in multifamily high-rises. *See* Gresham Report at 7. As the uncontroverted

Gresham Report notes:

> In the design of buildings, much of the 'arrangement and composition of spaces and elements' is driven by the constraints of site, building code, and building type. This is even more true in multifamily housing projects, which have repetitive units, typical room depths, and code-required bedroom windows. The constraints of life safety and current market expectation for certain types and sizes of apartments yield considerable similarly between all contemporary apartment projects of a given construction type.

*Id.* For example, building codes require at least two stairways per floor, separated by some

minimum distance. *Id.* Accordingly, the record points persuasively to the conclusion that utility,

not creativity, dictated Humphreys' decision to locate the two stairways in the Grant Park design

at opposite ends of the building and adjacent to the elevators. *See* Part IV.A, *supra*. A contrary

conclusion would seem to "impede, rather than promote, the progress of architectural

innovation." H.R. Rep. No. 101–735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6952.[44]

Even assuming for the moment that the overall arrangement of the Grant Park design

features is eligible for copyright protection, the discussion in Parts IV.C.1.(a)-(i), *supra*, makes

clear that, as reflected in the undisputed record, the Grant Park design and the Two Park Crest

design are not any more extrinsically similar than any two randomly selected high-rise multi-

family projects would be based on building code regulations and industry standard practices.

Gresham Report at 8; Greenstreet Report at 12. Both designs contain features such as elevators,

corridors, and exit stairwells, but those elements are arranged relative to one another in an

entirely dissimilar manner.   The two designs have a different shape, size, and exterior

---

[44] It is worth noting that in some circumstances, the extrinsic similarity and copyright validity analyses may not be entirely distinct. Indeed, the analyses merge or overlap where any alleged existing extrinsic similarity in building features or arrangement of building features is the result of building code requirements or common architectural practices.

appearance, and the "overall appearance of the buildings is quite different." Gresham Report at 20. For instance, the stairwells in the Two Park Crest building are opposite the elevator shaft, while in the Grant Park design, the stairwells are located behind the elevator shafts. *Id.* at 16. Moreover, as discussed in Part IV.C.1.(c), *supra*, the direct access concept in Grant Park consists of open lobbies clustered around a central public lobby, rather than a corridor. *Id.* By contrast, at Two Park Crest, "[u]nit entries are tucked away in the legs of an H-shaped resident corridor, creating a more private entrance experience to the unit – the 'elevator lobby' is visually separate from the resident corridors." *Id.* Indeed, the overall footprints of the two designs are highly different, as are the layouts of the units and floors within each design. Greenstreet Report at 12-13. Finally, Humphreys' expert offers no evidence as to what makes the two arrangements extrinsically similar, given the substantial summary judgment record to the contrary. Hence, "the overall form as well as the arrangement and composition of spaces and elements"[45] in the Grant Park design and the Two Park Crest design are not extrinsically similar. Thus, based on the summary judgment record, no reasonable jury could find that the Grant Park design and the Two Park Crest design are extrinsically similar.

It follows from this conclusion that summary judgment must be granted in favor of the defendants. Indeed, defendants are entitled to summary judgment only based on the results of the extrinsic similarity analysis. Although the Fourth Circuit has not specifically addressed whether a defendant who prevails only on the extrinsic similarity analysis prong of a copyright infringement claim should be granted summary judgment on that claim, the Ninth Circuit, which was the originator of the two-pronged extrinsic/intrinsic test, has addressed this issue. In *Funky*

---

[45] 17 U.S.C. § 101.

*Films, Inc. v. Time Warner Entertainment, Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006), plaintiff sued defendant, claiming defendant's screenplay infringed plaintiff's screenplay. The Ninth Circuit affirmed summary judgment for the defendant based on the extrinsic prong of the substantial similarity analysis and in the course of doing so, commented that: "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *See also Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994) ("For summary judgment, only the extrinsic test is important."); *Shaw v. Lindheim*, 919 F.2d 1353, 1361 (9th Cir. 1990) ("[I]t is for the trier of fact to determine whether the intrinsic test is satisfied."). Nevertheless, it is worth briefly addressing some aspects of the intrinsic similarity prong.

## 2. Intrinsic Similarity

The intrinsic similarity inquiry requires examining the total concept and feel of the works, but *only* as seen through the eyes of the intended audience of plaintiff's work. *Universal Furniture*, 618 F.3d at 436. Judge Learned Hand described the intrinsic test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Id.* (citing *Peter Pan*, 274 F.2d at 489) (internal quotations omitted).

Thus, a threshold question in the intrinsic similarity inquiry is the identity of the intended audience. Humphreys argues that intrinsic similarity should be evaluated from the perspective of the lay public. Defendants disagree, contending that, because architects design high-rise residential buildings pursuant to contracts with real estate developers, those developers with expertise in the field are the intended audience.

- 48 -

In determining the intended audience of a copyrighted work, "the relevant question that courts must ask . . . is whether the works are so similar that the introduction of the alleged copy into the market will have an adverse effect on the demand for the protected work." *Lyons*, 243 F.3d at 802. Thus, the intended audience has to be that audience to whom the building is marketed. And "a court should be hesitant to find that the lay public does not fairly represent a work's intended audience," and should only do so where the intended audience possesses "specialized expertise" that "go[es] beyond mere differences in taste and instead must rise to the level of the possession of knowledge that the lay public lacks." *Dawson*, 905 F.2d at 737.

Both parties present substantial arguments as to the identity of the intended audience in the present case.  On the one hand, it is important to be mindful that the default intended audience, as *Dawson* indicates, is the lay public, absent compelling evidence to the contrary, and that it is members of the public that have the ability to purchase condominiums in the Grant Park building or lease units in the Two Park Crest building.  On the other hand, defendants have proffered evidence that the intended audience of high-rise multi-family residential buildings do possess specialized knowledge.  Defendants' expert Gresham notes that "my market is and has been experienced developers and institutional real estate investors.  These developers and investors are typically *specialists*, themselves in multifamily housing . . ." Gresham Report at 25 (emphasis added).  Indeed, the *Lyons* court itself found that the district court had erred in its analysis of the intended audience inquiry by failing to consider evidence that the intended audience possessed "specialized expertise, relevant to the purchasing decision, that lay people would lack." *Lyons*, 243 F.3d at 802.

In any event, the identity of the intended audience for the Grant Park and Two Park Crest designs need not be resolved here for two reasons.  First, as noted above, because summary

- 49 -

judgment is appropriate for defendants on whether the two designs are extrinsically similar, the intrinsic similarity analysis is unnecessary in the present case.[46] *Funky Films*, 462 F.3d at 1077. Second, the intrinsic similarity analysis, as several courts have recognized, is typically not suitable for resolution on a motion for summary judgment. This is so because the very nature of the intrinsic test–examining an ordinary person's subjective impressions of similarities between two works–is typically the province of the jury. *Id.*

## V.

In sum, because no reasonable jury could conclude that the Grant Park design and the Two Park Crest design are extrinsically similar, there can be no inference that defendants copied the Grant Park design. Thus, summary judgment must be granted for defendants on the issue of infringement.[47] Additionally, because there is no evidence that Clark had access to the Grant

---

[46] Given that a plaintiff is required to prove *both* extrinsic and intrinsic similarity to survive summary judgment on a copyright infringement claim, summary judgment on the extrinsic similarity element is sufficient to defeat Humphreys' copyright infringement claim. *Universal Furniture*, 618 F.3d at 435.

[47] Given the result reached here–that summary judgment is required in the absence of substantial similarity between the two designs based on the extrinsic similarity inquiry–it is unnecessary to reach or decide a variety of issues the parties have raised in pending motions, including:

1. Defendants' arguments that there are no profits attributable to the alleged infringement (*see* Memorandum in Support of Lessard Defendants' Motion for Summary Judgment that the Park Crest Two Design was Not Copied and There is no Basis for Recovery of Defendants' Profits, Doc. 192-1 at 27-28; Defendant Clark Builder Group LLC's Memorandum in Support of its Motion for Summary Judgment of Noninfringement and Motion for Partial Summary Judgment as to Damages, Doc. 203 at 18-20; Brief in Support of Northwestern Defendants' Motion for Summary Judgment on Liability and on Plaintiff's Claims for Infringer's Profits, Doc. 207-1 at 15-20; The Penrose Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment of Noninfringement and Summary Judgment on Damages, Doc. 219 at 28-29).

- 50 -

Park design–a required element in Humphreys' copyright infringement claim–summary judgment for Clark is also appropriate on that ground.

An appropriate Order will issue.

Alexandria, Virginia
September 2, 2014

T. S. Ellis, III
United States District Judge

2. The Lessard defendants' argument that any presumption of copying has been rebutted (*see* Memorandum in Support of Lessard Defendants' Motion for Summary Judgment that the Park Crest Two Design was Not Copied and There is no Basis for Recovery of Defendants' Profits, Doc. 192-1 at 26-27).

3. The Penrose defendants' argument that Humphreys' copyright violates the merger doctrine (*see* The Penrose Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment of Noninfringement and Summary Judgment on Damages, Doc. 219 at 26-27).

4. Humphreys' motion for summary judgment on defendants' affirmative defenses (*see* Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, Doc. 215 at 9-21).